UNITED STATED DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X

Jose Gonzalez, by Irene Guzman,
Administratrix,

                       08-CV-2314(CPS)

          Plaintiff,

                       MEMORANDUM
   - against -                OPINION AND
                       ORDER

Commissioner of Social Security,

          Defendant.

------------------------------------X

SIFTON, Senior Judge.

The plaintiff, Jose Gonzalez, deceased ("plaintiff"), by
Irene Guzman, Administratrix ("Ms. Guzman"), brought this action
against the Commissioner of Social Security ("defendant") seeking
review of defendant's decision denying his claim for Social
Security disability benefits. Now before the Court is defendant's
motion for judgment on the pleadings pursuant to Rule 12(c) of
the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g). For
the reasons stated below, defendant's motion is granted.

**BACKGROUND**

Plaintiff's case has been heard by two Administrative Law
Judges on five separate occasions. Plaintiff has appealed these
Judges' findings on three occasions, and twice this Court has
remanded the case for further findings by the Commissioner.
Plaintiff's claims of disability are based on three classes of
ailments (asthma, back and joint pain, and depression), and there
are four time periods at issue. Given the complexity of the

record, the procedural history of this case is discussed prior to the facts, in order to render a clearer picture of the sequence of filings, decisions, and medical findings.

*Procedural History*

Plaintiff applied for disability insurance benefits on December 6, 1994, claiming that he had been unable to work since November 1, 1991 due to asthma. Transcript of the Record at 29-31 ("Tr."). The claim was denied at the initial and reconsideration levels, and plaintiff filed a request for a hearing before an administrative law judge ("ALJ"). *Id.* at 45. Plaintiff did not attend the hearing because he was incarcerated, and the ALJ dismissed the hearing request on September 24, 1996. *Id.* at 140-141. On October 21, 1998, plaintiff filed a request for review of the ALJ's dismissal of the hearing request. *Id.* at 142. The Appeals Council denied that request on January 28, 2000. *Id.* at 149-150. On July 20, 2000, this Court remanded the action for further administrative proceedings pursuant to 42 U.S.C. § 405(g). *Id.* at 5.

On September 18, 2000, the Appeals Council vacated the ALJ dismissal order. *Id*. at 153. A new hearing was held before ALJ O'Leary on May 17, 2001. ALJ O'Leary issued a decision finding that plaintiff was not disabled prior to March 31, 1996, the date he last met the insured status requirements of the Act.

Declaration of Patrick Herbst, Ex. 1 at p. 5 ("Herbst Decl.").
Plaintiff requested review by the Appeals Council, which
apparently took no action. On November 5, 2002, this Court
remanded the case to the Commissioner for further proceedings
pursuant to 42 U.S.C. § 405(g). On April 22, 2003, the Appeals
Council ruled that the record did not contain substantial
evidence to support ALJ O'Leary's finding that plaintiff
performed substantial gainful activity through 1995, and directed
the ALJ to make additional findings. Tr. at 343. In a decision
dated May 19, 2004, ALJ O'Leary found that plaintiff was not
disabled because his drug trafficking constituted substantial
gainful activity and there was no evidence of severe impairment
prior to November 11, 1994. *Id.* at 422. In a decision dated
November 5, 2005, the Appeals Council affirmed the findings that
there was no severe impairment prior to November 11, 1994 and
that plaintiff performed substantial gainful activity during the
period prior to April 1995. *Id.* at 435. The Appeals Council
remanded the case for further proceedings concerning the period
of April 1995 through March 31, 1996, during which plaintiff was
incarcerated. *Id.*

In a decision dated August 21, 2006, ALJ Faulkner found that
plaintiff's ailments, while severe, did not meet the requirements
for disability benefits, and that plaintiff was capable of
sedentary activity while incarcerated. *Id.* at 273. On January 19,

2008, the Appeals Council declined to assume jurisdiction. On February 29, 2008, the Appeals Council sent plaintiff and plaintiff's counsel a superceding notice concerning its action. Herbst Decl. ¶ 4(b), Ex. 2. Plaintiff thereafter filed a complaint in Federal Court.

On September 5, 2008, defendant made a motion to dismiss, claiming that plaintiff had failed to timely file his complaint. Plaintiff's counsel disputed this claim, stating that he had filed the complaint in a timely fashion, although he had not paid the filing fee at the time of filing, thereby delaying the Clerk's entry of filing on the docket. On October 21, 2008, I instructed the parties to brief the question of whether the failure to pay the fee rendered the filing of the complaint untimely. On December 12, 2008, defendant made a motion for judgment on the pleadings, and both parties briefed the merits of the case.[1]

*Non-Medical Evidence*

Plaintiff was born in 1957, and worked as a "cutter," cutting bindings for garments, from 1978 to 1991. *Id*. at 29, 59. This job entailed standing or walking and frequently lifting over fifty pounds. *Id*. at 60. After 1991, plaintiff had no reported

---

[1]Defendant appears to have abandoned the issue of whether the complaint was timely filed.

earnings. *Id*. at 58. In his 1994 application for disability benefits, plaintiff identified as his treating source the Western Queens Community Hospital in Astoria, New York, where he was seen in November, 1994 for asthma. *Id*. at 57, 58. Plaintiff reported that a friend did most of the household chores, and that his recreational activities included fishing and watching television. *Id*. at 58. Plaintiff further stated in his application that he was able to take the train and bus without difficulty. *Id*. Plaintiff met the insured status requirements of the Social Security Act through March 31, 1996.

On March 23, 1995, plaintiff was arrested and charged with money laundering.[2] Plaintiff pled guilty in 1995, and was sentenced to 37 months of incarceration. *See* Def. Memo. Appx. A.

Plaintiff again applied for disability benefits in 1998.[3] In conjunction with the 1998 application, he completed a questionnaire. *Id*. at 180-83. Plaintiff reported that he had lower back and leg pain since 1986, and that he stopped working in 1991, because pain prevented him from lifting or standing. *Id*. at 181. Plaintiff stated that he had severe asthma attacks and three admissions to the hospital. *Id*. He claimed that he had "curtailed his activities to none" and had to stay home and take oxygen. *Id*. at 183.

---

[2] *United States of America v. Jose Gonzalez*, 95-CR-744.

[3] The 1998 application is not at issue here.

Ms. Guzman was plaintiff's daughter. *Id*. at 17. At a hearing held regarding plaintiffs' case on May 17, 2001, Ms. Guzman testified that her father had suffered from chronic asthma since 1983, and that he had been hospitalized for it three or four times. *Id*. at 18. Ms. Guzman further testified that plaintiff had a herniated disk in his back from an accident in 1993 for which he needed surgery, and that he suffered from severe depression, for which he took medication. *Id*. at 21.

At a hearing held on January 30, 2004, plaintiff's son testified that during the period 1994-1996, plaintiff could not walk long distances, and required help to perform daily activities such as shopping, cooking, and cleaning. *Id*. at 291. Plaintiff's former girlfriend and mother of his children testified that plaintiff last worked in 1991 or 1992, that plaintiff's asthma was "bad" at that time, and that plaintiff suffered from depression as a result of the asthma, a car accident, several eye surgeries,[4] and the fact that he could not get a job. *Id*. at 296. Ms. Guzman testified that plaintiff was "really sick" during the period from 1994-1996, that he relied on oxygen tanks when he went out, that he visited the hospital once or twice a month for a year, that plaintiff used a cane after suffering a slipped disk in the car accident, and that plaintiff

---

[4]Medical reports pertaining to plaintiff's eye surgeries are not included in the record, and plaintiff does not include eye ailments in his claim.

was depressed and could not sleep. *Id*. at 300-01.

*Medical History before March 31, 1996*

In his 1994 disability benefits application, plaintiff did not identify any treating sources for the period prior to November 1994. *See* Tr. at 57-58.

The first record of medical treatment in the record is plaintiff's hospitalization for acute respiratory distress and asthma from November 11-14, 1994. *Id*. at 72, 73, 87, 179. At that time, plaintiff was intubated and treated with an inhaler and steroids. *Id*. 72, 74, 77. The medical summary produced by the hospital states that plaintiff had taken cocaine prior to his attack. *Id*. at 72. Plaintiff left the hospital against medical advice. *Id*. at 72, 73.

On January 31, 1995, plaintiff was examined by Dr. Edmund Balinberg, an internist *Id*. at 113-15. At that time, plaintiff stated that he stopped working three years previously because of difficulty breathing. *Id*. at 113. Plaintiff stated that he could not sleep at night due to shortness of breath, that he could not walk more than a block without needing to rest, and that a friend helped him with shopping and chores. *Id*. Dr. Balinberg observed that plaintiff's respiration rate increased with simple activities such as dressing, undressing, and walking a few steps into the room. *Id*. Dr. Balinberg also noted wheezing on

ausculation, which he believed might be chronic based on plaintiff's case history. *Id.* at 114. A chest x-ray was negative. *Id.* at 119. Pulmonary function testing showed that plaintiff's breathing improved after bronchodilators.[5] The diagnosis was bronchial asthma. *Id.* Dr. Balinberg further noted that plaintiff had no history of psychiatric hospitalization or treatment, and that he had a normal gait, normal ranges of motion in his cervical and lumbar spines, and straight leg raising of 90 degrees bilaterally.[6] *Id.* at 113-114. Dr. Balinberg concluded that plaintiff had limited ability to walk quickly, to walk long distances, to climb stairs, and that he had restricted capacity for lifting, carrying, pushing, or pulling heavy loads. *Id.* at 115.

On February 14, 1995, Dr. Anthony Buonocore, a state agency physician, examined plaintiff and concluded that plaintiff had bronchial asthma but that he could lift and carry ten pounds frequently and twenty pounds occasionally, stand, walk and sit

_____

[5]On pulmonary function testing, plaintiff's forced vital capacity was 1.24 L. before and 2.16 L. after bronchodilators. Tr. at 116. His one-second forced expiratory volume was .89 L./sec. before and 1.42 L./sec. after bronchodilators. *Id.* Dr. Balinberg commented that the improvement after bronchodilators was suggestive of a partially reversible condition. Tr. at 115.

[6]Straight leg raising, also known as a Lasègue test, is a means of diagnosing nerve root compression, which can be caused by a herniated disc. The patient lies flat while the physician raises the extended leg. If the patient feels pain in the back at certain angles (a "positive test"), the pain may indicate herniation. *See* http://www.medilexicon.com/medicaldictionary.php?t=90845 (last visited March 23, 2009).

for six hours each in an eight-hour day and do unlimited pushing and pulling. *Id*. at 34-41.

On February 21, 1995, plaintiff was again hospitalized. *Id*. at 96. The emergency room examining physician observed regular, spontaneous breathing. *Id*. at 121. Chest X-rays revealed no acute lung pathology and mild enlargement of the heart. *Id*. at 125. The diagnosis was heroin overdose. *Id*. at 96. Plaintiff was discharged and instructed to follow up with the Primary Care Center. *Id*. at 97.

On March 23, 1995, plaintiff was given a medical examination by the Metropolitan Correctional Center New York ("MCC") Health Services Unit in connection with his arrest. *Id*. at 396-97. Plaintiff reported a history of asthma since childhood. *Id*. at 397. The physician assistant heard wheezing and recommended referral to a physician; the diagnosis was a history of asthma. *Id*. at 396, 397. On March 25, 1995, plaintiff had an asthma attack because he had not yet received his asthma pump and pills from prison personnel. *Id*. at 380. He was given appropriate medication and scheduled for an appointment at the asthma clinic. *Id*.

On December 28, 1995, plaintiff returned to the MCC and underwent another medical screening examination. *Id*. at 185-86. The examiner noted a history of cocaine use and heard mild bilateral wheezes. *Id*. at 186. Plaintiff was again referred to

the asthma clinic, where he was examined on January 2, 2006. *Id*.
at 378. He stated that he had difficulty breathing, and the
examining physician heard diminished breath sounds bilaterally
and wheezing at the base of the lungs. *Id*. Plaintiff was
diagnosed with acute asthma, for which the examiner prescribed
nebulizing treatment with a Ventolin inhaler and diminishing
dosages of prednisone, a steroid. *Id*. The next day, plaintiff
stated that he needed medication to sleep. *Id*. The doctor
diagnosed asthma and anxiety, and recommended that plaintiff
continue with his prescribed treatment. *Id*.

On January 11, 1996, plaintiff arrived at the Federal
Medical Center at Lexington, where he was examined at the medical
and psychiatric clinics. *Id*. at 187. On January 18, 1996,
plaintiff told a Physician's Assistant that he had low back pain
since 1986 and was experiencing increased pain on sitting or
standing straight that decreased with lying down or walking. *Id*.
at 367. Range of motion was decreased due to pain but straight
leg raising was negative. *Id*.

On January 19, 1996, plaintiff was evaluated at the
Lexington psychiatric clinic, at which time plaintiff told the
doctor that he was very tense, could not sleep, was hungry all
the time, was on edge, had trouble concentrating, felt tired all
the time, felt worried most of the time, and had thoughts of
suicide but no plan or intent to carry out those thoughts. *Id*. at

368. The impression was major depression, for which the doctor prescribed Elavil. *Id.*

On February 7, 1996, plaintiff was seen at the prison medical clinic concerning his back problems. *Id.* at 371. The doctor observed increased lumbar lordosis[7] with muscle spasm, and lumbar x-rays showed lumbarization of the S1 vertebra[8] and facet arthritis at S12. *Id.* The doctor instructed plaintiff to do exercises and stretching, and referred him for a physical therapy consultation. *Id.* On February 12, 1996, the same doctor observed that plaintiff had multiple complaints concerning normal aches and pains. *Id.* at 372. Noting that plaintiff's anxiety was high and uncontrolled, the doctor diagnosed a conversion reaction.[9] *Id.* On February 16, 1996, plaintiff stated that he was doing better and that his main problem was chest congestion. *Id.* at 373. Nerve conduction studies were performed on February 27, 1996 and were normal. *Id.* On March 27, 1996, plaintiff reported that his left knee was locking and painful. *Id.* at 376. The doctor found that sideways movement caused clicking and slight

---

[7]Increased curvature of the lower back. *See id. at* 1032.

[8]Lumbarization is an anomaly of the junction between the lower back (lumbar) and the sacrum, whereby the top sacral vertebra develops as a lumbar vertebra, resulting in six lumbar vertebrae instead of five. *See Stedman's Medical Dictionary* 1034 (27th Edition, 2000).

[9]Conversion is defined as "an unconscious defense mechanism by which the anxiety which stems from an unconscious conflict is converted and expressed symbolically as a physical symptom; transformation of an emotion into a physical manifestation as in conversion hysteria." *Id.* at 406.

resistance, and X-rays were negative. *Id*. at 376, 187.

*Medical History After March 31, 1996*

On May 24, 1996, plaintiff reported to the prison doctor that his bones felt numb and hollow, that he had been falling down, and that his shoulder blade was painful. Tr. at 390. The doctor noted that plaintiff's legs appeared normal and that there was no edema[10] or inflammation, although there was a great deal of spinal muscle spasm. *Id*. The doctor diagnosed myositis[11] and lower limb paresthesias.[12] *Id*. at 392.

As of October 1996, prison medical staff classified plaintiff as restricted to sedentary duty not involving prolonged standing or lifting more than twenty pounds repetitively. *Id.* at 189. Plaintiff was able to engage in regular duties with medical restrictions through February 1997, for which he received good work evaluations. *Id*. at 190-91.

On May 15, 1997, following his release from prison, plaintiff was evaluated at the Western Queens Community Hospital regarding his complaints of depression. Tr. at 442. Plaintiff complained of temporarily losing his sense of smell and his mind

---

[10]An edema is "an accumulation of an excessive amount of watery fluid in cells or intercellular tissues." *Id*. at 566-67.

[11]Myositis is "inflammation of a muscle." *Id*. at 1176.

[12]A paresthesia is "an abnormal sensation, such as of burning, pricking, or tingling." *Id*. at 1316.

going "blank." *Id*. A mental status examination showed that plaintiff was not psychotic and had low frustration tolerance. *Id*. The diagnosis was depression. *Id*.

On May 29, 1997, an MRI of plaintiff's lower back showed a diffuse disc bulge at L4-L5 with a superimposed disc herniation compressing the right L5 nerve root.[13] *Id.* at 176. On June 6, 1997, a physician referred plaintiff to a spine surgeon. *Id.* at 448. On June 26, 1997, another physician diagnosed depression, and recommended a neurological work-up for seizures. *Id.* at 444. On July 9, 1997, a physician noted that plaintiff's herniated disc required strong anti-inflammatory medication, that surgery might be necessary, and that plaintiff was not fit to work. *Id.* at 177.

On July 18, 1998, plaintiff was admitted to the hospital for a week, after reporting a sudden onset of acute shortness of breath. *Id.* at 200, 206-07. Plaintiff was hospitalized and intubated again between October 10 and 15, 1998. *Id.* at 220. On February 10, 1999, plaintiff was pronounced dead after being admitted to the Western Queens Community Hospital emergency room. *Id.* at 168.

**DISCUSSION**

---

[13]Herniation is when a disc, the soft tissue between vertebrae, protrudes from its normal position, thereby pressing on the nerves and causing pain. *See id.* at 814.

## A. Standard of Review[14]

A court reviewing a decision of the Commissioner must determine whether the Commissioner of Social Security's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard."[15] *Green-Younger v. Barnhart*, 335 F.3d 99, 105 (2d Cir. 2003) (quoting *Curry v. Apfel*, 209 F.3d 117, 122 (2d Cir. 2000)). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (quoting *Richardson v. Perales*, 402 U.S. 389, 401; 91 S. Ct. 1420; 28 L. Ed. 2d 842 (1971)). An evaluation of the "substantiality of the  evidence must also include that which detracts from its weight." *Williams ex rel. Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld. *See* 42 U.S.C. § 405(g); *Perez v. Chater*, 77 F.3d 41, 46 (2d Cir. 1996). In

---

[14]The standard of review in disability insurance proceedings under Title II of the Social Security Act also applies to supplemental security income proceedings under Title XVI of the Act.  *See* 42 U.S.C. § 1383(c)(3). Similarly, the analysis of supplemental security income claims under Title XVI parallels, in relevant part, the statutory and regulatory framework applicable to disability claims under Title II. *See Barnhart v. Thomas*, 540 U.S. 20, 24-25 (2003).

[15]Plaintiff asserts that the proper standard of review is *de novo*, and alleges that there exists substantial evidence for his claims. However, that is not the standard for reviewing the Commissioner's determinations.

deciding whether substantial evidence exists, the court defers to the Commissioner's resolution of conflicting evidence. *See Clark v. Commissioner of Social Security*, 143 F.3d 115, 118 (2d Cir. 1998).

## B. Disability Determination Under the Social Security Act

The Social Security Act defines "disability" in relevant part as the "inability to engage in any substantial gainful activity[16] by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months..." 42 U.S.C. § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A)(SSI benefits). Further, a person will be determined to have a disability "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy..." 42 U.S.C. § 423(d)(2)(A); *see also* 42 U.S.C. § 1382c(a)(3)(B)(SSI benefits). A person cannot be considered disabled if alcoholism or drug addiction would be a contributing material factor to a determination that he was

---

[16] Substantial gainful activity is defined as work that involves "doing significant and productive physical or mental duties" and "[i]s done (or intended) for pay or profit." 20 C.F.R. § 404.1510; *see also* 20 C.F.R. § 404.1572.

disabled. 42 U.S.C. § 423(d)(2)(C). To be eligible for benefits, a claimant must be insured and must have been disabled during the insured period. 42 U.S.C. § 423(a)(1)(A); *see Arnone v. Bowen*, 882 F.2d 34, 37-38 (2d Cir. 1989). The opinion of the treating physician is binding in the absence of substantial evidence which contradicts the treating physician's opinion. *Wagner*, 906 F.2d at 861; *Schisler v. Bowen*, 851 F.2d 43 (2d Cir. 1988).

Regulations promulgated by the Social Security Commissioner set forth a five step process to determine whether an impairment or impairments demonstrate a disability. The Second Circuit has described the five step process as follows:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience.... Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity[17] to perform his past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

---

[17] Residual Functional Capacity ("RFC") is defined by the SSA as follows: "Your impairment(s), and any related symptoms, such as pain, may cause physical and mental limitations that affect what you can do in a work setting. Your residual functional capacity is what you can still do despite your limitations." 20 C.F.R. § 416.945(a).

*Rosa v. Callahan*, 168 F.3d 72, 77 (2d Cir. 1999)(internal quotation marks and citation omitted); *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998); 20 C.F.R. § 404.1520(a)(4)(I-v); *see also* 20 C.F.R. § 416.920 (SSI benefits).

At step one, "substantial" work activity is "work activity that involves doing significant physical or mental activities. 20 C.F.R. § 404.1572(a). Work may be substantial "even if it is done on a part-time basis." *Id*. Gainful activity is defined as "work activity that you do for pay or profit" or "the kind of work usually done for pay or profit, whether or not a profit is realized." 20 C.F.R. § 404.1572(b).

At step two, if a claimant does not have a severe medically determinable physical or mental impairment, he will be found not disabled without consideration of vocational factors. *See Bowen v. Yuckert*, 482 U.S. 137; 107 S. Ct. 2287; 96 L. Ed. 2d 119 (1987) (upholding the regulatory requirement that a claimant make a threshold showing of medical severity). "If the impairments are not severe enough to limit significantly the claimant's ability to do most jobs, by definition the impairment does not prevent the claimant from engaging in any substantial gain ful activity." *Id*. at 146

The claimant has the burden of demonstrating that he meets all requirements for benefits. 42 U.S.C. § 423(d)(5)(A). However, once the claimant passes step four, the burden shifts to the

Secretary to show that the claimant can perform other substantial, gainful work available in the national economy. *Carroll v. Secretary*, 705 F.2d 638, 642 (2d Cir. 1983); *Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982).

In addition to the five-step analysis outlined above, the Commissioner has promulgated regulations governing evaluations of the severity of mental impairments. 20 C.F.R. § 404.1520a. The reviewing authority must determine first whether the claimant has a "medically determinable mental impairment." § 404.1520a(b)(1). If the claimant is found to have such an impairment, the reviewing authority must rate the degree of functional limitation resulting from the impairment(s) with regard to four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. § 404.1520a(c)(3). If the claimant's mental impairment is severe, the reviewing authority will first compare the relevant medical findings and the functional limitation ratings to the criteria of listed mental disorders in order to determine whether the impairment meets or is equivalent in severity to any listed mental disorder. § 404.1520a(d)(2). If so, the claimant will be found to be disabled. If not, the reviewing authority will then assess the claimant's residual functional capacity. § 404.1520a(d)(3). *See also Kohler v. Astrue*, 546 F.3d 260, 265-55 (2d Cir. 2008).

A claimant's subjective experiences of disabling conditions
are insufficient to establish a claim for disability benefits.
There must in addition be medical signs and laboratory findings
showing a medical impairment that could reasonably be causing the
symptoms. 20 C.F.R. § 404.1529(a), (b). When a claimant's
statements about his symptoms and limitations suggest a greater
restriction of function than is demonstrated by the objective
medical evidence, the Commissioner considers the claimant's daily
activities; the nature, location, onset, duration, frequency, and
intensity of the pain or other symptoms; factors precipitating or
aggravating the symptoms; the type, dosage, effectiveness, and
side effects of medication; any other treatment; and any other
measures utilized to relieve the pain or other symptom. 20 C.F.R.
§ 404.1529(c).

## C. The Commissioner's Assessment of Plaintiffs' Disabilities

In order to be eligible for disability benefits, plaintiff
was required to establish that he was disabled prior to March 31,
1996, when his insured status expired. Plaintiff was required to
furnish medical and other evidence to establish the existence of
the claimed disability. 42 U.S.C. § 423(d)(5)(A).

The Commissioner has made separate findings for three
different periods. First, in its decision dated November 5, 2005,
the Appeals Council adopted ALJ O'Leary's finding that plaintiff
had not demonstrated a severe impairment prior to November 1994,

and thus he was not disabled during that period ("Period One").
Tr. at 435. Second, the Appeals Council adopted ALJ O'Leary's
finding that plaintiff was engaging in substantial gainful
activity related to drug trafficking between November, 1994, and
his arrest and incarceration in March, 1995 ("Period Two"). *Id*.
Third, for the period between April 1995 through March 31, 1996,
the ALJ found[18] that despite having severe impairments, plaintiff
retained the ability to do simple, repetitive, unskilled
sedentary work, although he could not perform any of his past
relevant work ("Period Three"). *Id*. at 278. Plaintiff challenges
each of these findings, claiming that plaintiff was disabled
during all relevant time periods.

### 1. Period One: November 1, 1991 to November 10, 1994

The Commissioner correctly concluded that plaintiff failed
to establish that he had a severe medically determinable
impairment at step two of the analysis. during the 1991 to 1994
time period. Plaintiff failed to submit any medical records
concerning the period. Although plaintiff claimed that he had
been disabled due to asthma since November 1, 1991, plaintiff did
not identify any treating source prior to November 11, 2004, when
he was admitted to Western Queens Community Hospital for
respiratory distress and asthma. Tr. at 57-58. Plaintiff has not

---

[18]Because the Appeals Council declined to assume jurisdiction following
this ruling, the ALJ's findings are the last statement available of the
Commissioner's position on this point.

sustained his burden at step two of the inquiry, which requires
him to show that he had a medically documented "severe
impairment." 20 C.F.R. § 404.1520(a)(4)(I-v).

**2. Period Two: November 11, 1994 to March, 1995**

The Commissioner found that plaintiff was engaging in
substantial gainful activity, and that accordingly he failed to
satisfy step one of the analysis. There is insufficient evidence
in the record to support a denial of the claim on this ground.
However, there is sufficient evidence to support a denial of the
claim at step five of the analysis. The Commissioner found that
plaintiff was capable of performing sedentary work in Period
Three.[19] Plaintiff has not alleged that his condition was worse
during the period from November 11, 2004 through March of 2005
than during the period after March 1995. Therefore, the
Commissioner's findings as to Period Three apply with equal force
to Period Two.

Additionally, several medical reports created during Period
Two support a finding that plaintiff was capable of performing
sedentary work, which, as discussed further in connection with
the ALJ opinion governing Period Three below, precludes a finding
that plaintiff was disabled. On February 14, 1995, Dr. Anthony
Buonocore, a state agency physician, examined plaintiff and

_____

[19]This finding was supported by substantial evidence, as described in
the following section.

concluded that plaintiff had bronchial asthma and that he could lift and carry ten pounds frequently and twenty pounds occasionally, stand, walk and sit for six hours each in an eight-hour day and do unlimited pushing and pulling. *Id*. at 34-41. On December 28, 2005, a medical examiner heard only mild bilateral wheezes on auscultation. *Id*. at 185-186. As of October, 1996, prison staff restricted plaintiff to sedentary duty not involving lifting greater than twenty pounds repetitively or doing prolonged standing. *Id*. at 189. Plaintiff was able to engage in regular duties with these medical restrictions, for which he received good work evaluations. *Id*. at 190-91.

### 3. Period Three: April 1995 to March 31, 1996

In her August 21, 2006 opinion after remand from the Appeals Council,[20] ALJ Faulkner found that plaintiff did not engage in substantial gainful activity from April 1, 1995 through March 31, 1996. Tr. at 273. Proceeding to step two, ALJ Faulkner found that the plaintiff's asthma, lower back pain, knee pain, depression, and anxiety were "severe" within the requirements of 20 C.F.R. 404.1520(c). *Id*. At step three, ALJ Faulkner determined that these medically determinable impairments did not meet or medically equal one of the listed impairments listed in 20 C.F.R. 404 subpart P. Appendix 1 ("Appendix l"), and therefore plaintiff

---

[20]As this was the last opinion by the Commissioner in plaintiff's case on the matter of the third time period, its conclusions represent that of the Commissioner.

was not entitled to benefits based on a "per se" disabling condition.[21] *Id*. ALJ Faulkner continued to steps four and five of the analysis, finding that, although plaintiff could not perform his previous gainful activity, he retained the residual functional capacity to perform sedentary work as defined in 20 C.F.R. 404.1567. *Id*. Plaintiff challenges the findings that he did not suffer from a "per se" impairment and that he retained the capacity to perform sedentary work.

ALJ Faulkner's findings were supported by substantial evidence. Because the findings that plaintiff was capable of performing sedentary activity necessarily imply that plaintiff did not suffer from a per se disabling condition, the threshold for which is higher than the inquiry regarding sedentary activity,[22] only the findings pertaining to step 5 of ALJ Faulkner's analysis are discussed below.

Substantial evidence supports ALJ Faulkner's finding that plaintiff retained the residual functional capacity to perform sedentary work in the national economy consistent with his residual functional capacity, age, education, and work experience. The term "residual functional capacity" is defined as

---

[21]At step three, objective medical evidence is considered to determine if the criteria of "per se" disabling impairment has been met or equaled. If so, the claim will be allowed without consideration of vocational factors such as residual functional capacity, age, education, and work experience.

[22]*See* 20 C.F.R. Part 404, Subpart P, Appendix 1, Section 3.00C, Section 1.02, Section 1.04, and Section 12.04.

the most an individual can still do after considering the effects of physical and/or mental limitations. 20 C.F.R. 404.1545.

Federal regulations define sedentary work as follows:

> Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met.

20 C.F.R. 404.1567(a).

ALJ Faulkner found that plaintiff's physical and mental limitations did not limit him from performing sedentary activity. These findings are supported by substantial evidence, as described below.

### i. Asthma

The medical and non-medical evidence shows that plaintiff suffered from asthma over many years, but the existence of a severe condition is not sufficient to establish that a person is disabled. The evidence is consistent with a finding that plaintiff was capable of performing sedentary activity. Although plaintiff's family members testified that he needed help performing daily chores and could not walk for long distances, Tr. at 291, 296, in his 1994 application for benefits, plaintiff stated that he was able to take the train and bus without difficulty. *Id*. at 58. The medical evidence indicates that plaintiff's serious asthma attacks were infrequent and well

controlled with medication. In November 1994, plaintiff was
admitted to the hospital, intubated, and treated with an inhaler
and steroids. Tr. at 72, 74, 78. Plaintiff's shortness of breath
was brief. *Id*. at 72. In February, 1995, plaintiff was admitted
to the hospital and was diagnosed with a heroin overdose. *Id*. The
physician observed regular, spontaneous breathing, and chest x-
rays revealed no acute lung pathology. *Id*. at 121-125. In May,
1995, two days after plaintiff's arrest, he suffered an asthma
attack because he had not yet received his medication; plaintiff
did not require hospitalization. *Id*. at 380. In December, 1995, a
doctor's report indicates that plaintiff was using his
medications and was not in acute distress. *Id*. at 186. In
January, 1996, plaintiff reported difficulty breathing and was
treated for acute asthma. *Id*. at 378. In March, 1996, plaintiff
reported that he had difficulty breathing at night. *Id*. at 376.
There are no subsequent medical reports concerning asthma during
plaintiff's incarceration. The next mention of breathing
difficulties was in July of 1998, long after plaintiff's coverage
period expired. *Id*. at 200. These symptoms are consistent with
the regulatory definition of sedentary activity.

    *ii. Spine and Knee*

    Although plaintiff reported in 1998 that he had significant
back and leg pain since 1986, *id*. at 181, the medically
documented evidence regarding plaintiff's back and knee

impairments indicates that he was not prevented from sitting for prolonged periods, as is required for sedentary activity. In December 1994, when he first applied for disability, plaintiff did not mention a back impairment. *Id*. at 55. On January 31, 1995, Dr. Balinberg noted that claimant had back pain, but motion of the lumbar spine was full, straight leg raising was negative, and plaintiff had a normal stance and gait. Tr. at 113-115. Based on these findings, the agency review report stated that plaintiff was capable of lifting 20 pounds occasionally, 10 pounds frequently, standing or walking about 6 hours in an 8-hour workday, sitting about 6 hours in an 8-hour workday, and unlimited pushing and pulling. *Id*. at 35. When he was screened at MCC on March 23, 1995 and December 28, 1995, plaintiff did not report any back problems. *Id*. at 396-97, 401.

Reports from January and February 1996 noted limited motion of the lower back, with increased lumbar lordosis and rigidity, but straight leg raising was negative. *Id*. at 367, 371, 377. Nerve conduction studies were normal, and the examining doctor noted that plaintiff's complaints concerned normal aches and pains. *Id*. at 372, 373. On March 27, 1996, a physician found some clicking on sideways movements of plaintiff's knee, although the X-rays were negative, and plaintiff never previously complained of a knee ailment. *Id*. at 187. On May 24, 1996, a physician noted that plaintiff's legs appeared normal. *Id*. at 390.

The other evidence relating to plaintiff's back impairments
concerns the time period after March 31, 1996.[23] The objective
evidence did not support plaintiff's subjective reports of back
and knee pain. Plaintiff's medically recorded physical
limitations did not prohibit plaintiff from performing sedentary
activity.

*iii. Depression*

The evidence concerning plaintiff's depression does not
indicate that he was incapable of performing sedentary activity.
Although plaintiff's family members stated anecdotally that he
was depressed in 1995, plaintiff did not report being depressed
to a doctor until January, 1996. *Id*. at 368. Plaintiff's daughter
testified at the May 17, 2001 hearing that plaintiff suffered
from severe depression, for which he took medication, but she did
not specify how, if at all, this affected his functioning. Tr. at
21. At the January 30, 2004 hearing, plaintiff's former
girlfriend also testified that plaintiff was depressed, without
specifying any limitations other than to say that "he was feeling
really bad and he couldn't do anything." *Id*. at 296. Plaintiff's
daughter stated that plaintiff became depressed in 1995 and could
not sleep at night, spending the night pacing. *Id*. at 301.

---

[23]An October 16, 1996 report from a prison doctor noted chronic back
syndrome, but plaintiff had a normal gait, and was permitted to engage in
sedentary activity. *Id*. at 188-189. A May, 1997 MRI of the lumbar spine
revealed a disc bulge at L4-5 with disk herniation and right L5 nerve root
compression. *Id*. at 176.

In January, 1996, Dr. Riggs, a psychiatrist at FMC
Lexington, diagnosed major depression and prescribed medication.
*Id*. at 368-70. One month later, plaintiff told Dr. Riggs that he
was doing better. *Id*. at 373. Plaintiff did not receive further
psychiatric treatment until after his insured status expired. *Id*.
at 442. Plaintiff received good work evaluations while
incarcerated, *id*. at 190-91, indicating that he had the ability
to concentrate and persist at simple tasks despite his
depression. The remaining evidence concerns the time after
plaintiff's eligibility for coverage expired.[24] These assessments
are consistent with a finding that plaintiff had the residual
capacity to perform sedentary activity.

*iv. Work in the National Economy*

Considering plaintiff's age, education, work experience, and
residual functional capacity, ALJ Faulkner found that there is
work existing in the national economy that plaintiff could
perform prior to March 31, 1996. *Id*. at 277, 279. This finding is
supported by substantial evidence. Plaintiff was thirty-nine when
his insured status expired, making him "younger individual" under
the regulations. *See* 20 C.F.R. § 404.1563(b). Rules 201.18 and
201.21 of the Medical-Vocational Guidelines contained in Appendix

---

[24]In May, 1997, plaintiff complained of losing his sense of smell and of
his mind going blank. *Id*. at 442. Mental status examination showed that
plaintiff was not psychotic, not suicidal, and had low frustration tolerance.
*Id*. The diagnosis was depression. *Id*.

2 to 20 C.F.R. Part 404, subpart P. Rule 201.18 directs a finding
of "not disabled" for a younger individual with a limited
education and unskilled or no work experience who can do
sedentary work. Furthermore, because "age, education, and work
experience are not usually significant factors in limiting the
ability of individuals under age 50 to make an adjustment to
other work, the conclusion whether such individuals who are
limited to less than the full range of sedentary work are
disabled will depend primarily on the nature and extent of their
functional limitations or restrictions." Social Security Ruling
("SSR"), 1996 SSR LEXIS 6, at *5-6 (1996). Because plaintiff's
functional limitations did not prevent him from performing
sedentary work, he was not disabled.

**D. Plaintiff's Arguments in Support of His Claim**

Plaintiff argues that the ALJ failed to consider all
impairments together, in order to determine if, taken together,
they justified a finding of disability under 20 C.F.R. §
404.1523. Plaintiff is incorrect. The ALJ found that plaintiff's
impairments were "severe" within the meaning of the Regulations
during the period lasting from April 1, 1995 to March 31, 1996,
"but not 'severe' enough to meet or medically equal, *either
singly or in combination*, any of the impairments listed" in the
regulations. Tr. at 274 (emphasis added). A review of the
evidence supports this finding. Plaintiff offers no evidence that

his combination of ailments entitled him to a per-se finding of incapacity or inability to perform sedentary work.

At oral argument, plaintiff's counsel contended that plaintiff's death from asthma in 1999, just three years after the end of the period for which plaintiff was insured, indicates that plaintiff's asthma was indeed serious. The Commissioner does not contend that the asthma was not serious, but rather that, as of March, 1996, plaintiff was not exhibiting symptoms serious enough to warrant a finding that he was disabled. The record indicates that plaintiff's physical condition deteriorated significantly between March, 1996 and his death. At the end of his life, plaintiff may have been disabled as defined by the regulations, but the Commissioner's finding that this was not the case as of March, 1996 was supported by substantial evidence.

## CONCLUSION

For the reasons stated herein, defendant's motion for judgment on the pleadings is granted. The Clerk is directed to transmit a copy of the within to all parties and the assigned Magistrate Judge.

SO ORDERED.

Dated:     Brooklyn, New York
           March 25, 2009

                              By: /s/ Charles P. Sifton (electronically signed)
                                   United States District Judge